[Crim. No. 8078. Second Dist., Div. Two. Sept. 25, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. ROLAND CAUSEY et al., Defendants and Appellants.

Albert C. S. Ramsey, Thomas W. Cochran, Russell E. Parsons and Nicolas Ferrara for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Norman H. Sokolow, Deputy Attorney General, William B. McKesson, District Attorney, and Robert Lederman, Deputy District Attorney, for Plaintiff and Respondent.

FOX, P. J.—In an information filed by the District Attorney, defendants were charged in Count 1 with conspiracy to commit grand theft in that they agreed together and with unknown persons to commit grand theft, to cheat and defraud by criminal means, to obtain money and property by false pretenses and by false promises with intent not to perform such promises. In pursuance of said conspiracy, 25 overt acts by one or the other or both of said defendants were alleged.

The defendants were charged in Counts 2, 3 and 4 with grand theft. In Count 5 Cruz alone was charged with grand theft.

After an extended trial[1] the jury found defendants guilty as charged in Counts 1 and 2. They also found Cruz guilty as charged in Counts 3, 4 and 5 but found Causey not guilty as to Counts 3 and 4. The court sentenced each defendant to imprisonment in the state prison for the term prescribed by law. They have appealed.

The conspiracy charge and grand theft counts 2, 3 and 4 grow out of the purported sale of a property known as Mid-City Hospital, located on East Washington Boulevard, Los Angeles, and assignment of funds from an escrow at the Long Beach Escrow Company opened for the asserted purpose of handling the transfer of the Mid-City Hospital property. Count 5, which relates to Cruz alone, involves assignment of funds by him from an escrow set up to carry out a lease arrangement with Dr. Richards for space in the Lincoln Hospital in Buena Park which assertedly belonged to Cruz.

Viewing the evidence in the light most favorable to

---

[1]The trial consumed approximately six weeks. The reporter's transcript is 5,510 pages. The defendants at their request were permitted to represent themselves. The briefs cover 566 pages.

the People as we must where it is contended, as in the instant case, that the evidence is insufficient to support the judgments of conviction, the essential facts are:

Cruz, who falsely represented that he was an M.D., purchased the Mid-City Hospital property in March 1960 from Dr. Charlotte Brown Pahl, who had operated it for some 40 years. It ceased, however, being operated as a hospital about the middle of 1958. The property was unoccupied and in a rundown condition at the time Cruz acquired it. In lieu of a down payment, Cruz agreed to do certain rehabilitating work on the building.[2] The total consideration for this property was a promissory note in the sum of $55,000 executed by Cruz and secured by a deed of trust on the property.[3]

Causey was a real estate salesman in Long Beach who set up an escrow at the Long Beach Escrow Company for the asserted purpose of disposing of the Mid-City Hospital property. Florence Lucero, referred to in this proceeding as Mrs. Florence Clarke, was employed as an escrow officer by the Long Beach Escrow Company, through defendant Causey, about the middle of July 1960. Causey explained to her that this escrow company was just starting, that it was made up of a number of businessmen, and that he was more or less in charge of its operations. While she was employed there, Causey was the only one who ever gave her any orders. The first escrow she opened was the Cruz-Hudson, Mid-City Hospital Escrow* on July 22, 1960. She prepared it from information furnished her by Causey. These instructions were signed later by Cruz in Causey's real estate office. This escrow provided for the sale of the Mid-City Hospital prop-

[2]Pursuant to this agreement, Cruz tore out some walls and put up a few studs over which they were going to plaster, but did nothing further.

[3]No interest was payable on this indebtedness for two months after the closing of escrow. Thereafter, Cruz was obligated to pay interest at the rate of $275 per month (6 per cent of $55,000) for 10 months, after which the payments were to be increased to $500 per month, including 6 per cent interest and were later increased to $1,000 and then $2,000 per month. Cruz made only one payment of interest in the amount of $275, which was for the period May 15 to June 15, 1960. He never made any of the principal payments.

Proceedings were instituted on behalf of Dr. Pahl to foreclose this trust deed and pursuant thereto, on March 28, 1961, a document entitled "Notice of Default and Election to Sell under Deed of Trust" was recorded in the official records of Los Angeles County.

*This escrow is sometimes referred to in the testimony as the Cruz-Nelson, Mid-City Hospital Escrow.

erty to J. Nelson Hudson or his corporate nominee by Cruz for $334,000. It provided for $100,000 cash, a note secured by a trust deed for $120,000 in favor of Cruz, and the assignment of trust deeds on other property to him in the amount of $114,000. It seems that $25,000 was to be paid into the escrow at the time it was opened. However, Mrs. Clarke did not receive any cash and as a consequence inquired about the matter from Causey. He explained to her that she would get this $25,000 when the papers were signed and that the additional $75,000 would be in on or before the close of escrow. She never received either of these amounts.

Maxine Woodman, a niece of Hudson (the ostensible purchaser), picked up these unsigned escrow papers on the afternoon of July 22 for delivery to Causey's real estate office at 2210 East Pacific Coast Highway in Long Beach. Approximately a week later, Mrs. Clarke observed these instruments again on a desk, at which time they were signed. She placed them in the file. She telephoned Causey in regard to the $25,000 referred to in the escrow instructions. She inquired where the check was. He replied, "Don't worry, you'll get it." Causey instructed Mrs. Clarke that if anyone called concerning the escrow she was to let him know and he would talk to the party; that she should have written instructions from all parties before she could give out any information about the escrow and that she was not to discuss it with anyone.

On October 3, Mrs. Clarke received an envelope bearing a postmark date of October 2, 1960, together with an undated letter signed "H. P. Reichl." This letter notified the escrow company that Mid-City Hospital, Inc.,[4] was the corporate nominee of "purchaser" Hudson. After Mrs. Clarke received the letter signed "H. P. Reichl" notifying her that the corporate nominee of J. Nelson Hudson was Mid-City Hospital, Inc., she read the letter to Causey over the telephone. He said, "Okay." Although Mrs. Clarke attempted to communicate with Hudson requesting his written approval of the nomination of Mid-City Hospital, Inc. as corporate assignee, she never received any document signed by him

[4]Miss Reichl, Cruz's proclaimed fiancee, was president of this corporation. She and "G." Cruz, apparently defendant "Gonzalez" Cruz, were two of the incorporators. The third was F. Cruz. Defendant Cruz's full name is "Federico" Gonzalez Cruz. There is testimony indicating that defendant Cruz signed both Cruz names as incorporators of Mid-City Hospital, Inc.

which named a corporate nominee. She prepared amendments to the escrow extending the time for closing from September 23, 1960, to November 15, 1960, and sent them out for signature. They were later returned with the signatures of H. P. Reichl and Gonzalez Cruz. The only instruments in the escrow file which bore signatures purporting to be those of J. Nelson Hudson were the initial escrow instructions and the initial amendment thereto.

While Mrs. Clarke was connected with the escrow office, no one was introduced to her as J. Nelson Hudson nor did she meet a man of that name. She asked Cruz who Hudson was about the middle of August. He stated that Hudson was a busy man, that he always wanted things mailed to him, and that they would take care of seeing that Hudson got the papers.

Mrs. Clarke spoke to Causey approximately ten times concerning the $25,000 which was to be deposited in the escrow. Each time he told her that she would be getting it. At no time did Hudson deliver any funds to Mrs. Clarke for deposit in the escrow. Upon one occasion in the latter part of September 1960 she did see for a brief period a $25,000 check in the office bearing the purported signature of Hudson. However, this check was not given to her for deposit in the escrow. Another escrow officer, Mrs. Hopkins, took it stating she had been instructed by Causey to bring it to his office. He testified that this was not a proper check, that he understood Cruz got Mrs. Woodman (Hudson's niece) to sign it, and that it was not signed by Hudson. Cruz inquired around the latter part of September whether such a check had been received for deposit in the escrow and Mrs. Clarke informed him it had not. Cruz stated he had seen Hudson put such a check in the mail. However, Cruz later stated to investigating officers that he had never seen J. Nelson Hudson.

There was testimony from Mr. Stanton, an associate of Causey in the real estate office, that he knew a person by the name of J. Nelson Hudson, that he met this person at a cocktail party at Maxine Woodman's house, that Hudson worked in a factory in one of the neighboring towns in the Los Angeles area, and that he was Maxine Woodman's uncle.

After an investigation of this escrow had been started by the Real Estate Commissioner, Causey, in a conversation with Stanton, explained that it was necessary to establish the existence of J. Nelson Hudson. Stanton was present during a telephone conversation by Causey with a person called Bill,

concerning J. Nelson Hudson. Causey asked Bill to call from Colorado Springs and represent himself as being J. Nelson Hudson and to appear irate and to inform the police that he was J. Nelson Hudson, that he did exist, and that he lived in Colorado Springs, and to inform the police to the effect ''I hear you're looking for me and here I am, so what do you want?''

In connection with the name J. Nelson Hudson, at the direction of Causey, Stanton prepared an envelope which he photostated to show that it had been mailed from Colorado Springs to 2210 East Pacific Coast Highway, Long Beach (Causey's address), or to the escrow.

From July 1960 until October 1960, Stanton saw Cruz at Causey's real estate office once or twice a week. Stanton also testified that telephone calls back and forth between Causey and the Long Beach Escrow Company ''occurred daily, continuously.''

Mrs. Clarke testified with respect to a purported assignment of the $120,000 trust deed[5] on the hospital property in favor of Cruz to a Rene A. Eglestine, a married man, for a purported consideration of $100,000. Causey dictated escrow instructions for this assignment on August 19, 1960. In connection with this assignment and escrow, Mrs. Clarke received a check of the same date in the sum of $10,000, bearing the name of Rene A. Eglestine as the drawer. Payment on this check was stopped. On August 22 Mrs. Clarke received a letter from Eglestine informing her that payment on the check for $10,000 was stopped and the escrow which provided for the assignment of the $120,000 trust deed from Cruz to Eglestine was cancelled.[6]

---

[5]This trust deed was a third encumbrance upon this property, being subject to the purchase money deed of trust for $55,000, plus a later encumbrance of $6,000.

[6]The evidence with respect to this check indicates that it was written on Friday; the account on which it was drawn having been opened the day before; that payment was stopped on Monday for the stated reason that the assignment to which it related was cancelled; that the check was purportedly made by Rene A. Eglestine, a married man, whereas the account on which it was drawn had been opened by Rene A. Eglestine, a housewife; that the check upon which the bank opened the Eglestine account was dishonored; that a letter sent to the address on the signature card was returned unopened; that this $10,000 check was the only one ever drawn against this account and that no deposits were ever made to this account other than the dishonored check.

## THE DiMAIO TRANSACTION

Charles DiMaio is a jeweler whose firm, The American Diamond Company, is located in Newport Beach. On the evening of July 24, 1960, he met Cruz and Causey at his place of business. Cruz was accompanied by his fiancee, Helene P. Reichl. He told DiMaio that he was looking for an engagement ring. Cruz and Miss Reichl selected a 7-carat diamond. Cruz also selected for himself a 3¾ carat diamond. After some haggling over price, $10,000 was agreed upon as the price for the two rings. DiMaio asked, "Is it cash?" Cruz replied, "Just as good as cash." During the negotiations, Cruz turned around while Causey was on the telephone and said, "Say, Causey, can we buy these from the money we have on the trust deed in escrow?" Causey replied, "Sure, why not? You got $100,000 there on deposit." DiMaio said he thought this was a cash deal. Cruz then stated that he owned a hospital and that it was in escrow for $334,000; that they had $100,000 in cash on deposit; that if DiMaio put the diamonds in escrow he could, at the close of escrow, get the $10,000 or, if he preferred, a trust deed. Causey inspected the rings, said they were "very good" and told the "doctor," "Go ahead." Causey also stated that they had about $120,000 in trust deeds coming into this escrow. Later that evening DiMaio asked Causey if that $100,000 was on deposit in the escrow. Causey replied, "Yes," and further stated, "I know there is $100,000 deposit in escrow with the Long Beach Escrow ... you don't have to worry about it. The money is there."

The deal was not concluded that evening but arrangements were made to go to the Long Beach Escrow Company at 1 o'clock the next day. DiMaio took the two diamond rings with him and met Causey and Cruz at Causey's office, 2210 East Pacific Coast Highway. After lunch they went to the escrow company. There arrangements were concluded for the acquisition of the diamonds by Cruz. An escrow was prepared. Both defendants gave instructions to the escrow officer with respect to the transaction. This included the preparation of a promissory note for $10,000 secured by a trust deed on the Mid-City property. When the papers were signed by Cruz, DiMaio delivered the two rings to him. In agreeing to this arrangement, DiMaio relied upon the representations and statements made to him by both Cruz and Causey. DiMaio did not receive any money at any time from either Causey or Cruz in connection with this transaction or from

the escrow. He did not regain possession of either of the diamond rings[7] from either of defendants.

A few days later, on July 30, Cruz purchased from DiMaio a ladies' diamond watch, valued at $1,400 and a man's Elgin, valued at $300. This additional obligation of $1,700 was added to the escrow involving the diamonds. Cruz also signed a promissory note for the agreed price of the watches and placed on it the number of the aforesaid escrow covering the diamonds at the Long Beach Escrow Company. In making this deal DiMaio also relied upon the previous statements which Cruz and Causey had made concerning the escrow. Had DiMaio known that there was no money in the escrow, he would not have delivered either the rings or the watches to Cruz.

## THE CONSPIRACY (Count 1)

Each defendant contends that the evidence is insufficient to sustain his conviction. Causey urges in particular that the evidence does not establish that he was a conspirator. We shall first state the principles relevant to this aspect of the case.

The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. (Pen. Code, §§ 182, 184; *People v. Brownstein*, 109 Cal.App.2d 891, 892 [241 P.2d 1056]; *People v. Pierce*, 110 Cal.App.2d 598, 610 [243 P.2d 585]; *People v. Frankfort*, 114 Cal.App.2d 680, 688 [251 P.2d 401].) The existence of the conspiracy may be established by circumstantial evidence. (*People v. Steccone*, 36 Cal.2d 234, 237-238 [223 P.2d 17].) The agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute (*People v. Benenato*, 77 Cal.App.2d 350, 358 [175 P.2d 296]; *People v. Brownstein, supra*), but it need not be shown that the parties met and agreed to undertake the unlawful acts. (*People v. Sampsell*, 104 Cal.App. 431, 438 [286 P. 434].) It is not necessary that the overt acts be criminal. (*People v. Gordon*, 71 Cal.App.2d 606, 628 [163 P.2d 110].) If such acts are done as a step toward the furtherance of the conspiracy they are sufficient. (*People v. Gilbert*, 26 Cal.App.2d 1, 23

[7]Later DiMaio saw the man's diamond ring at Abe's Diamonds and Jewelry, a pawnshop on South Main Street in Los Angeles, when Lieutenant Hull took him there.

[78 P.2d 770].) The overt act may be performed by only one of the conspirators and yet be sufficient, for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. (*People* v. *Creeks,* 170 Cal. 368, 374 [149 P. 821] ; *People* v. *Pierce, supra.*) Finally, once the conspiracy is established all evidence of the substantive crimes becomes admissible against all participants, even though the other conspirators were not present. (*People* v. *Temple,* 15 Cal.App.2d 336, 339 [59 P.2d 417] ; *People* v. *Gordon, supra.*)

 Before a conviction may be reversed on the ground that the evidence is insufficient to justify the verdict, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached by the jury. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) We must assume in support of the judgment the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether the facts "justify the inference of guilt." (*People* v. *Deysher,* 2 Cal.2d 141, 149 [40 P.2d 259].)

 It is the function of the trier of fact to evaluate the credibility of the witnesses and the weight to be given the testimony of an individual witness even though it is inconsistent. (*People* v. *Ashley,* 42 Cal.2d 246, 266 [267 P.2d 271].)

 The trier of fact may accept a portion of a witness' testimony and disbelieve the remainder. On appeal, that portion of a witness' testimony which supports the judgment is accepted, not that portion which would tend to defeat the judgment. (*People* v. *Thomas,* 103 Cal.App.2d 669, 672 [229 P.2d 836].)

 Applying these principles to the factual picture at hand, it is apparent the jury could reasonably infer that defendants entered into a corrupt agreement to commit an offense prohibited by statute, and to do various overt acts in furtherance of the objects of that agreement. Although the evidence reflects that the Mid-City Hospital property was in a dilapidated condition and, according to the opinion of one witness, not worth more than $30,000, the defendants were nevertheless purporting to sell it for the highly inflated price of $334,000. The escrow instructions and the amendments thereto were prepared under instructions from Causey and purported to cover the consideration, terms and conditions of the sale of the property by Cruz to Hudson who was obviously a dummy in the transaction and which resulted in a

transfer of the property by Cruz to a corporation under his control without any consideration. There was never in fact any bona fide deposit of any funds in the escrow[8] although it was represented by both defendants that $100,000 had been placed in it.

Thus by means of the establishment of a virtually fictitious escrow, the technique of issuing assignments of funds from the escrow, which defendants knew were not there, the use of a dummy purchaser, the misrepresentation that the Mid-City Hospital property was in fact valuable, and attempting to give the appearance that the main escrow and the collateral escrows relating to assignments of funds were solid transactions, the jury could reasonably find defendants had entered into an agreement to cheat and defraud by criminal means and to obtain money and property by false pretenses and by promises which they did not intend to perform at the time they were made. So interrelated and harmonious were the operations of defendants as disclosed by the documents and the testimony that honest deduction could not but reasonably have inferred their conscious collaboration with the definite purpose of obtaining the money and property of others in violation of section 182, subdivisions 1 and 4, Penal Code. The evidence is clearly sufficient to sustain the convictions of the defendants in the conspiracy count.

The basic difficulty with defendants' argument is that they would have this court reevaluate the credibility of the witnesses, draw inferences contrary to those drawn by the jury, and reweigh the evidence. Illustrative of this unprofitable approach is Causey's statement that certain ''testimony of DiMaio was impeached,'' and his challenge as to the truthfulness of DiMaio's testimony that at the time he parted with the diamonds he had relied on the representations of Cruz and Causey. These were of course arguments for presentation to the jury whose duty it was to determine where the truth lay.

## THE GRAND THEFT COUNTS

The grand theft charges are based on the theory of obtaining money by false pretenses. To support a conviction on that theory, ''it must be shown that the defendant made a false pretense or representation with intent to defraud the

---

[8]In view of the circumstances surrounding the Eglestine check of $10,000 (see footnote 6, *supra*), the jury could reasonably draw the inference that this was not a bona fide transaction.

owner of his property, and that the owner was in fact defrauded. ▇ It is unnecessary to prove that the defendant benefited personally from the fraudulent acquisition [citation]. ▇ The false pretense or representation must have materially influenced the owner to part with his property, but the false pretense need not be the sole inducing cause [citation]." (*People* v. *Ashley*, 42 Cal.2d 246, 259 [267 P.2d 271], quoted with approval in *People* v. *Weitz*, 42 Cal.2d 338 at p. 343 [267 P.2d 295].) ▇ The intent to defraud is a question of fact, to be determined from all the facts and circumstances of the case. ▇ There need not be specific testimony by the victim that he was induced to part with his property by the fraudulent statements of the accused. It is sufficient if the inference of reliance reasonably may be drawn from all the evidence. (*People* v. *Frankfort*, 114 Cal.App.2d 680, 697-699 [251 P.2d 401].)

### THE DiMAIO TRANSACTION (Count 2)

▇ Applying these principles to the DiMaio transaction it is quite apparent without further elaboration on the significance of the evidence above recited that the evidence amply supports the verdict and judgment that these defendants were guilty of grand theft on the theory of false pretenses.

▇ But Causey points out that section 1110, Penal Code, provides that in order to sustain a conviction on this theory a false token or writing must accompany the pretense, or the pretense must be proved by the testimony of two witnesses, or by the testimony of one witness and corroborating circumstances. He then asserts that no such corroboration was produced. In this he is in error. The testimony of Mr. Preece, which he gave at the preliminary hearing and on which he was cross-examined by both defendants, was read to the jury since he had died between the date of the preliminary hearing and trial. He corroborated DiMaio that Causey represented there was $100,000 in the escrow. Also, there was evidence that the defendants used documents to effect the transaction with respect to the diamonds; *viz.*, the escrow instructions in the preparation of which each participated and the assignment. These documents, as part and parcel of a false scheme, constituted false tokens. (*People* v. *Pugh*, 137 Cal.App.2d 226, 234 [289 P.2d 826].)

### ROGOW and HILL ACCEPTANCE CORPORATION TRANSACTION (Count 3)

▇ In this transaction in which Cruz was found guilty,

he told Rogow that he was an M.D.; that he was arranging the sale of a hospital for $334,000; that the sale was in escrow; and that $25,000 cash was in the escrow. Rogow was shown the escrow papers. Cruz wrote down his approximate net worth as in excess of $2,000,000. Relying on these representations, Rogow gave Cruz a check for $5000 for which he received an assignment for $5,681.82 for his company, Hill Acceptance Corporation, from the escrow. Neither Rogow nor his company received any funds through either the escrow or from Cruz. As previously pointed out, Cruz was not an M.D. and the jury could reasonably infer that the escrow did not represent a bona fide transaction. Also, the evidence indicates that Cruz was far from being a wealthy man. He had been involved in bankruptcy proceedings in 1958, 1959, 1960 and 1961. Furthermore, he defaulted on the note and trust deed he signed in connection with the purchase of the Mid-City Hospital property and foreclosure proceedings were instituted.

## LAPIN and REALTY CAPITAL COMPANY
## TRANSACTION (Count 4)

On this count also Cruz alone was convicted. Lapin was in the factoring business. Cruz told Lapin that he was a physician; that he had practiced for a considerable time at the Mid-City Hospital and had done very well there but he had sold it to J. Nelson Hudson. Cruz showed Lapin escrow papers with respect to this deal which indicated that $25,000 was already in this escrow. Lapin asked him if there was already $25,000 deposited on this sale. Cruz told him there was. He also told Lapin that he had just purchased the Lincoln Hospital in Buena Park and that he was in the process of furnishing it. He showed Lapin a check book on a Los Angeles bank which had ''Gonzalez Cruz, M.D.'' imprinted on the cover and which contained checks with printing on the upper left hand portion, ''Gonzalez Cruz, M.D.,'' etc. Cruz did have a checking account at this bank but his balance was never greater than the initial deposit of $1,000. Also, he exhibited a statement that indicated he was worth $2,302,000. Cruz, of course, had not practiced at or operated the Mid-City Hospital but by exhibiting the check book with his name printed thereon and on the blank checks followed by ''M.D.,'' Lapin believed he was a medical doctor. And he was not the owner of the Lincoln Hospital. The falsity of other representations has already been pointed out. As a result of these false

representations on the part of Cruz, Lapin was induced to give Cruz a check for $5,000 for which his company, Realty Capital Company, received an assignment of $5,600 from the escrow. Neither Lapin nor his company received any funds from this transaction.

### THE SCHILLER TRANSACTION (Count 5)[9]

 The salient testimony discloses that Cruz told Michael Schiller that he was the seller of the Mid-City Hospital; that he was an M.D.; that he was the owner of the newly completed Lincoln Hospital in Buena Park; and that a Dr. Richards, who was a pathologist, was leasing a part of this hospital; that an escrow had been opened at the Manhattan Escrow Company in which there was to be, or there was, $10,000 deposited by Richards; that he was in the process of buying equipment and furnishing this hospital; that hospital equipment was very expensive, so he was short of funds. Cruz inquired of Schiller whether he would be interested in purchasing an assignment from these escrow funds at a discount. As a result of this conversation Schiller and Cruz met at the Manhattan Escrow Company at about 4:30 p.m., September 23, 1960. Schiller asked Cruz what kind of a doctor he was and Cruz said he was an M.D. He showed Schiller a financial statement similar to the one he had exhibited to Rogow and Lapin. Schiller was shown an escrow between Cruz and Richards in which it appeared that $8,000 had been deposited with the escrow company. Schiller asked the escrow officer, Mrs. Brandt, if there was $8,000 in the escrow. She replied there was an $8,000 check in the escrow in regard to which she had called the bank and learned the funds were there. In examining the escrow, Schiller noticed a provision which gave Dr. Richards a right to cancel this escrow within a 30-day period and get his money back. When asked about this provision, Cruz stated, "That is just attorney talk; I don't know; this is a good escrow." Relying upon these representations, Schiller gave Cruz a check for $7,200 for an assignment of $8,000 from the escrow at its close. Schiller got nothing back from either Cruz or the escrow.

Supplemental instructions for the Lincoln Hospital escrow were signed by Cruz on September 10th, requiring him to deposit $15,000 in the escrow and specifying the final date for compliance, i.e., closing, as noon, September 19, 1960. Cruz only placed $2,000 in this escrow. On September 22

---

[9]Causey was not involved in this transaction.

(the day *before* the assignment of $8,000 from the escrow by Cruz to Schiller) the escrow officer mailed a letter to Cruz informing him that the seller had deposited written instructions cancelling the escrow. As a consequence of the cancellation of the purchase and sale escrow of the building, Dr. Richards cancelled his lease escrow and received back his $8,000 deposit. Lapin was so notified by a letter from Mrs. Brandt dated October 5, 1960.

 As to these last three counts, on which Cruz alone was convicted, the evidence discloses the making of false representations whereby the victims were induced substantially to part with their property, irrespective of what checking they may have done as to escrows. The jury could readily infer the intent to defraud from the salient facts recited *supra*.

 The evidence summarized above reveals a similar modus operandi by Cruz as to each of the substantive counts; i.e., obtaining money or property through misrepresentations concerning an escrow; hence, as to Cruz, the testimony of each victim suffices to corroborate the testimony of every other victim. (*People* v. *Weitz,* 42 Cal.2d 338, 347 [267 P.2d 295].) Furthermore, he used documents to effect the transactions involved in each count; e.g. escrow instructions and assignments. These documents were part and parcel of his false schemes and constituted false tokens. (*People* v. *Pugh,* 137 Cal.App.2d 226, 234 [289 P.2d 826].) Thus the requirements of section 1110 *re* corroboration were adequately fulfilled.

## MISCONDUCT OF PROSECUTOR?

Defendants argue at length that the prosecutor was guilty of misconduct which prevented them from having a fair trial and thus they were denied due process.

 ''As applied to a criminal trial, denial of due process is a failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial.'' (*Lisenba* v. *State of California,* 314 U.S. 219, 236 [62 S.Ct. 280, 86 L.Ed. 166, 180].) ''Whether a prosecutor has been guilty of prejudicial misconduct must be determined in the light of the particular factual situation involved. Previous authority is of little help.'' (*People* v. *Lyons,* 50 Cal.2d 245, 262 [324 P.2d 556].)

To put this aspect of the case in proper focus, it should be borne in mind that defendants appeared in propria persona throughout the long trial. It is therefore understandable that procedural and other problems would arise during the course of the trial, and that in the circumstances the trial judge would take great pains, as he did, to see that the rights of defendants were protected.

Examination of the record discloses that the court admonished the jury on numerous occasions that statements by counsel are not evidence and also stressed that the jury must look entirely to the proofs in ascertaining the facts. It is presumed that the jury heeded the court's admonitions in this respect and performed their duty accordingly. (*People* v. *Sutic*, 41 Cal.2d 483, 494 [261 P.2d 241].)

Also militating against any prejudice is the circumstance that an objection to the particular matter in question has been sustained. (*People* v. *Kendrick*, 56 Cal.2d 71, 91-92 [14 Cal.Rptr. 13, 363 P.2d 13].) Also, before the objectionable remarks may be challenged on appeal they must, as a general rule, be opposed at the time they are made and the court requested to admonish the jury concerning them. (*People* v. *Codina*, 30 Cal.2d 356, 362 [181 P.2d 881].)

At this point it should be noted that all of the asserted misconduct on the part of the prosecutor took place while Deputy District Attorney Lederman was conducting the People's case, which was approximately the first half of the trial. Because of illness he was relieved of presenting further evidence on behalf of the People on July 14, 1961. Deputy District Attorney Fagan took over this responsibility.

Examination of the various items about which defendants complain reveals that: (1) in a number of instances no objection or protest was made to the asserted misconduct at the time the incident occurred and no request was made to admonish the jury to disregard it; (2) in other instances the remark was stricken and the jury was admonished or properly instructed with respect to the particular matter; (3) in some instances, where a timely and proper objection was made, it was sustained;[10] (4) upon other occasions the judge

---

[10]Illustrative of these incidents are Causey's complaints of references by the prosecutor to: (1) a "nonexistent and fictitious instrument"; (2) "members of the Causey clan"; (3) "a file of manufactured trust deeds"; (4) "Just a piece of paper"; and (5) the prosecutor's asking a witness if she saw Causey strike a certain person. As to (1), (2) and

was simply admonishing or directing the prosecutor with respect to certain aspects of trial behavior, such as, e.g., not to interrupt until the question was completed, not to argue after stating his objection, and not to attempt to direct the defendants (that the court would take care of that); (5) some of the incidents were disposed of out of the presence of the jury.

In support of their contention that Deputy District Attorney Lederman was guilty of misconduct, defendants emphasize the fact that he was held in contempt by the trial judge as a result of his conduct during the trial of the case. To put this contempt proceeding in proper focus, it will be helpful to review the proceedings leading up to it:

While Lederman was in the midst of propounding a question to Rogow, Cruz interrupted by saying, "I object, your Honor." Lederman responded, "Please be quiet." The court admonished Cruz not to interrupt until the question was completed. The court further commented, *inter alia*, "I will do the directing and not the District Attorney." Lederman responded, "Yes, your Honor, I'm sorry."

A few minutes later while still examining the same witness, after Lederman had apparently concluded his question Cruz said, "I object." Lederman replied, "Shut up." The court responded, "Now, Mr. District Attorney." Lederman said, "I'm sorry, I'm sorry." In explanation Lederman said, "I'm trying to make time, and he [Cruz] is interrupting me." After some further comments between Lederman and the court, the court stated, "Now, if anybody is directing these parties here, it is going to be the court." A few minutes later Lederman asked the witness: "Have you seen this Exhibit 7-I before?

"A. Yes, I have.

"Q. And when and where did you first see it?

"MR. CRUZ: Your Honor, I request to see Exhibit 7-I.

"MR. LEDERMAN: It has been marked for identification and you have seen it.

"THE COURT: Now——

"MR. LEDERMAN: It's been there before.

"THE COURT: Now, Mr. District Attorney, you are ask-

---

(4) no objection or protest by either defendant was voiced at the time the remark was made. As to (3) the remark was stricken on motion. As to (4) the judge commented that the deputy district attorney was arguing. As to (5) the court sustained an objection on the ground the matter was not proper redirect examination.

ing questions. You are not running this case. Now, just quit directing people. Now, that is beginning to be contemptuous conduct. Now, stop it.

"... Now, you are not here to undertake to tell everybody what they are to do and not to do. That is my function, and when you do assume it, why, in the heat of battle or in the heat of controversy, it need not get to that length, and it is not going to do that in my court.

"MR. LEDERMAN: Your Honor, I move that your Honor disqualify himself on the grounds that the People are not getting a fair and impartial trial in this court room.

"THE COURT: Mr. District Attorney, I have admonished you, and I hold you in contempt. You proceed. Motion denied."

Before adjourning for the day the court admonished the jury, among other things, not to draw any inference one way or the other from this incident or the remarks of either the deputy district attorney or those of the court, that they were not evidence.[11]

 It is quite apparent from the above and from the later comments of the court that the prosecutor was held in contempt for violating the court's admonitions not to interrupt and "not to make argument" and not to give directions to the defendants, such as, for example, telling Cruz to "Shut up." It was, of course, improper for counsel not to heed the admonitions and orders of the judge. Obedience to the orders of the trial judge is necessary to the orderly trial of a case.

 The episode between the prosecutor and the trial judge does not establish that the prosecutor's conduct of the trial resulted in prejudice to the defendants. Actually, it seems that the incidents leading up to this episode between the court and counsel would be more likely to create sympathy for the defendants as the "under-dogs", since they as laymen were in a legal affray with a trained and experienced lawyer, rather than operate to their disadvantage. That the jury was able to render a discriminating verdict is indicated

[11]Lederman was requested to remain after the jury had been excused. There was further colloquy between Lederman and the court with respect to the contempt citation and the circumstances leading up to it. The disposition of the contempt was put over to a later time. At the next session of court Deputy District Attorney Fagan took over the task of presenting the People's case.

by the fact that while they found Causey guilty of Counts 1 and 2, they also found him not guilty on Counts 3 and 4.

In this connection, it will be recalled that the trial judge denied motions for a new trial on behalf of each defendant. In the course of announcing his ruling on these motions, he stated, "I am satisfied that the defendants have had a fair trial and, of course, the jury has spoken." In this procedural context it may properly be said that "the trial court considered such contention [asserted misconduct of the district attorney] at the time of denying the motion for a new trial. It has a broad discretion in determining whether questions or other conduct of counsel caused prejudice." (*People* v. *Pearson*, 111 Cal.App.2d 9, 21 [244 P.2d 35].) It is apparent that the trial court acted well within its discretion in impliedly holding that the conduct of the prosecutor did not prejudicially affect the rights of the defendants and that they had a fair trial.

## ADMISSION OF EVIDENCE

Defendant Causey contends that the court committed prejudicial error in the admission of evidence. He complains principally of statements made out of his presence by Cruz, Mrs. Hopkins, Mrs. Clarke and Mrs. Brandt. Causey and Cruz were partners in a conspiracy, hence the statements of Cruz during its existence and in furtherance of its objects were admissible against Causey, even though made out of his presence since they are considered as exceptions to the hearsay rule. (*People* v. *Garcia*, 201 Cal.App.2d 589, 592 [20 Cal.Rptr. 242]; *People* v. *Curtis*, 106 Cal.App.2d 321, 325 [235 P.2d 51]; Code Civ. Proc., §§ 1870, subds. 6, 7, and 1850.)

 The statements of witnesses Hopkins, Clarke and Brandt, out of the presence of Causey, related essentially to the escrows and the deposit of funds therein or the absence of such deposit. These escrows and the funds deposited therein (or the absence of such funds) formed a part of the transaction which was itself the fact in dispute, and their statements relative to the presence or absence of funds or checks in the escrows were properly received in evidence as part of the res gestae.

 Finally, Causey refers to testimony of a deputy real estate commissioner with respect to certain statements made by Cruz to him and urges that this testimony was inadmissible as to him (Causey) because the statements were made

after Cruz's arrest and hence the conspiracy had terminated. These statements concerned Cruz's version of the $25,000 check purportedly signed by J. Nelson Hudson. His statement to the investigating officer with respect to that matter was at variance with Causey's recital of it. At the trial Cruz took the stand and reiterated essentially what he said to the investigating officer regarding this matter. Miss Reichl, called as a witness in behalf of Cruz, testified similarly. In view of this firsthand testimony as to the same matter by these two witnesses, it would seem clear that the testimony of the officer did not materially affect Causey's substantial rights; hence there was no prejudice even assuming it was error to permit the investigating officer to testify with respect to Cruz's statements regarding the particular transaction.

Causey has appealed from the judgment and order denying his motion for a new trial. Since such an order is not now appealable, his purported appeal from said order is dismissed.

The judgment as to Causey is affirmed.

The judgment (and sentence, which are one—*People* v. *Sweeney*, 55 Cal.2d 27, 33, footnote 1 [9 Cal.Rptr. 793, 357 P.2d 1049]) as to Cruz is affirmed.

Ashburn, J., and Herndon, J., concurred.

The petition of appellant Causey for a hearing by the Supreme Court was denied November 20, 1963.