**Enrique Reyes LEYVAS et al.,**
Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 15700.

United States Court of Appeals
Ninth Circuit.

Aug. 13, 1958.

Gladys Towles Root, Forno & Umann, Burton Marks, Los Angeles, Cal., for appellants.

Laughlin E. Waters, U. S. Atty., Lloyd F. Dunn, Los Angeles, Cal., for appellee.

Before FEE, CHAMBERS and BARNES, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

Appellants Enrique Reyes Leyvas, Rudolph Reyes Leyvas, Seferino Reyes Leyvas, Rudolph Angel Lara, Alex Perez De La Loza, Raul Castulo Nuncz, Angel Jose Padilla, Gilbert Queseda and Lonnie Rodriguez were indicted together with some twenty-five other persons upon a charge of conspiracy to violate the narcotic laws (21 U.S.C.A. § 174) and upon various other counts charging some of them with receiving, concealing, transporting and selling heroin. Appellants were tried by a jury. Motion was made by their attorney that they be furnished, at government expense, with a daily typewritten transcript. This was refused by the court. Motions for acquittal and mistrial were made at the close of the case for the prosecution. Ten other defendants were acquitted by the court at this time. These motions were denied as to appellants and one other defendant, William Pablo Holmes. At the end of the case, the court denied motions of appellants for acquittal, but entered judgment of acquittal for Holmes. Appellants were found guilty. Judgment was entered, and each was sentenced. Each has appealed, and the appeals have been consolidated.

■ Appellants say that several diverse conspiracies were involved and that these radiated from one central figure, as the spokes from the hub of a wheel. This would be ground for reversing the judgment of conviction for conspiracy, if it were true. However, the trial court exercised great care and circumspection to prevent trial of other issues not directly connected with the one illegal

combination of which each of appellants is shown to have been a willing and knowing participant. The trial court severed transactions which might possibly have been considered independent transactions if viewed from a highly technical standpoint. The court ordered acquittal of all defendants who did not have some direct connection with appellant Rudolph Reyes Leyvas, who was the central figure of the conspiracy proved. The court struck all testimony relating to defendants acquitted from the record, and gave not only precautionary instructions in that regard, but also was painstaking in repeated admonitions to the jury to exclude from consideration evidence concerning the acquitted defendants. The latter had in general made purchases of heroin from one Jose Ruiz, a conspirator who eventually testified for the government and who was shown to have been associated in this criminal combination not only with Rudolph Reyes Leyvas, mentioned, but with almost every one of the other defendants. The evidence thus stricken was competent against each of these conspirators, because, although the purchases from Jose Ruiz did not happen in the presence of any of the other appellants, such testimony did show the nature and extent of the illegal combination.

■ Indeed, the trial court may have been hypertechnical in acquitting these defendants. Each of them was dealing in and came into possession of a contraband article knowingly and willfully. There was an unlawful conspiracy proved between Rudolph Reyes Leyvas and others to violate the law by engaging in the receiving, concealing, transporting and selling of heroin contrary to a federal statute. The purpose of each to resell was not a necessary element, but in any event could have been inferred. The adherence to a unified conspiracy could have been found by the jury. In order to participate in an unlawful combination, one need not know the description or identity of the principal conspirators or the number or names of the other associates in crime. One must, it is true, know the illegal nature of the enterprise and its general purposes and implications, and· voluntarily and willfully act in concert with the others in the criminal activities.

■■ If he does join in criminal acts with intent willfully to carry out the illegal design shared in common with others, he need not know the extent of the operations or the number of the confederates. Therefore, appellants could not have been prejudiced by this evidence as to the nature and extent of the acts of others who joined in illegal transactions in furtherance of a conspiracy of which certain of the appellants were the originators and the key figures. Appellants were bound by the acts of all others who joined the criminal combination and moved in concert to accomplish the illegal design, whether a particular appellant knew the identity of any such participants or the number and description of all such confederates.

■ Appellants complain that the trial court did not give an instruction to the effect that a defendant cannot be found guilty "on circumstantial evidence alone" "unless the proved circumstances are not only consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion."

This omission was not error. Appellants did not ask for such an instruction, and did not except because it was not given. We will not consider the omission as plain error to which no exception was taken. It was not error.

This instruction has been the subject of grave criticism. Many trial courts refuse to give it. It should never be given when the evidence is not wholly circumstantial. Here practically all proof as to each conspirator is direct. The only prime fact which may be said to have been established by circumstantial evidence is that appellants were dealing in narcotics. However that may be, the record establishes beyond peradventure that the dealings were exclusively in narcotics, especially heroin. Often

indirect evidence is more persuasive than direct. People do not carry snuff around in a certain type rubber container used for that purpose only in the narcotics trade. They do not cut snuff with milk sugar before sale. Purchasers do not pay over four hundred dollars for an ounce of any other brown powder normally. Nor do the purchasers and sellers take "fixes" of any other substance to establish verity. Purchasers of other materials do not claim swindles if the results expected from heroin are not obtained by "fixing." The record reeks with the argot of traffickers in products of the poppy. The record shows beyond cavil that here was a tremendous dispensing operation of forbidden drugs. We adjudge that, as to each of appellants, the proved circumstances are not only consistent with the hypothesis that the particular defendant is guilty, but are irreconcilable with any other conclusion.

The convicted defendants were not fringe dealers or purchasers. Some of them were the "big shots," as they are vulgarly called. Some were the importers and operators who were the heart and soul of the conspiracy. The evidence will be reviewed only to show that there was a wholesale importing and dispensing operation, and that each defendant knowingly and willfully performed a criminal part therein. Rudolph Reyes Leyvas, as before noted, was the key figure. He was proved to have a direct connection with each person and transaction in the operation in which any other appellant took part, and a connection indirectly in many others. Angel Jose Padilla induced Jose Vasquez Ruiz to use heroin. After a considerable use of the narcotic, Padilla took the witness to see Rudolph Reyes Leyvas, referred to above. Leyvas refused to sell the ounce of heroin sought by Padilla. Padilla gave Ruiz $180.00 thereafter, and he was told to go back to Rudolph Leyvas and promise to pay the balance for an ounce. Rudolph Leyvas later gave Ruiz a folded newspaper, within which, when opened subsequently by Padilla, was found white

carbon paper containing a brownish powder. Padilla and Ruiz then met two girls, to whom a portion of the brown powder was sold for $30.00, and each of the four persons present "fixed." Thereafter, Rudolph Leyvas introduced Jose Vasquez Ruiz to one Rudy Ruiz, who will hereafter be called "Big Rudy," and Rudolph Leyvas then told Big Rudy that Jose Ruiz would thereafter buy from Big Rudy. Whereupon, the latter sold some brown powder to Jose Ruiz. In 1949 Jose Ruiz went to a hotel where Rudolph and Seferino Leyvas were living. He found some brown powder, "fixed" with it, and thereafter, when he met Seferino Leyvas, he paid the latter for the powder used, warning the latter to be more careful in placing narcotics. Jose Ruiz was thereafter in prison until about September 10, 1953, when he was deported to Mexico. He returned illegally to the United States on September 11. Thereafter, he met Rudolph Leyvas with the defendant Raul Castulo Nunez. In the presence of the latter, Rudolph Leyvas informed the witness that he, Rudolph, had some "good stuff" and that it could be cut down the middle. The witness understood this to mean that an equal amount of sugar could be added before resale. Thereafter, Nunez took Jose Ruiz to the house of Rudolph Leyvas, who sold Jose Ruiz half an ounce of heroin for $150.00 cash, the balance of $50.00 to be paid later. Elizabeth Ruiz, wife of Jose Ruiz, accompanied Nunez and Ruiz to the house of Rudolph Leyvas. After the sale, Jose Ruiz gave the heroin to his wife, and she concealed it. Jose Ruiz then cut the substance with milk sugar and sold half of it, using the remainder himself.

In 1955, Jose Ruiz was arrested. Rudolph Leyvas refused to go on his bond at the request of Elizabeth, because, he told her, it might arouse suspicion and it would be disclosed that Ruiz was "pushing" for Leyvas. At a later time, after being referred to him by Rudolph, Elizabeth went to Enrique Leyvas, who instructed another appellant, Alex Perez De La Loza, to give Elizabeth narcotics.

On a subsequent occasion, there was difficulty about delivery. Angel Padilla happened to come in. De La Loza gave a brown lunch bag to Padilla, and the latter handed Enrique Leyvas money. Leyvas asked Elizabeth if Padilla could "cut up his stuff" at her house, since Padilla had no place to do it. At her house, Padilla opened the lunch bag and found it contained the usual rubber receptacles filled with brown powder. After that, Elizabeth was persuaded by Padilla to take "fixes" herself. Thereafter she lived with him, and during this time delivered brown powder, which she obtained from Padilla, and, in company with Padilla, delivered it to Ray Mendoz and collected money from him for several months. The above incident connects De La Loza. There was a previous transaction which also shows clearly that Nunez and Enrique Leyvas were participants. Elizabeth had been asked by a purchaser to get some "stuff." She called Rudolph Leyvas, who had Big Rudy deliver an ounce, for which she paid $375.00 and which she sold for $425.00. On the next occasion, when she wanted another ounce, Rudolph Leyvas told Elizabeth that he could not come over, but would send Enrique Reyes Leyvas. Enrique Leyvas told her he would send Raul Castulo Nunez over with the narcotic. An hour later, Nunez arrived and delivered the usual rubber container filled with brown powder. Elizabeth delivered the brown parcel to the purchaser and received money which she paid to Enrique Leyvas.

Thus Enrique Reyes Leyvas is shown to have a connection with his brother, Rudolph Leyvas, and also to be a participant in the conspiracy. An independent witness, William Joseph Smith, also testified that Enrique Leyvas interested him in the purchasing of narcotics on the representation that the price was $350.00 per ounce, and the "stuff" could be "cut down the middle." He thereupon made several purchases from Enrique. He bought the substance as heroin, sold it as heroin, and received no complaints. Enrique later asked him for money, which the witness owed on a previous buy. Smith asked Enrique whether white heroin could not be obtained, and Enrique responded that all the heroin would have to be beige, since a person coming from Mexico carrying two or three kilos had been killed.

The other brother, Seferino Reyes Leyvas, was also closely connected with Rudolph Leyvas and a participant in the conspiracy. A purchaser had requested more narcotics of Jose Ruiz, who called Rudolph Leyvas and was told to come to the house of the mother of Rudolph. Jose went with Elizabeth, his wife. There they saw Rudolph Leyvas and Seferino Leyvas. Jose explained to Rudolph that he was going to buy an ounce, cut it, and sell two ounces. Rudolph took $400.00, but explained he would have to borrow the ounce. Seferino asked for the money, saying it was his deal. Rudolph refused to give the money, and Seferino "got mad." Rudolph Angel Lara came in, and Seferino told Lara to give an ounce to Jose, who followed Lara and received an ounce of brown powder, which Jose purchased and later sold as heroin.

Later, Jose called Rudolph Leyvas, who informed him that the latter would have to borrow another ounce from his brother, Seferino. Rudolph called Seferino, who arrived later. Rudolph Angel Lara also came in, and Elizabeth was there with her husband. Rudolph wished to borrow an ounce, and Seferino demanded the money first. Jose handed the money to Rudolph in the amount of $400.00. Rudolph handed this sum to Seferino, less about $20.00. Jose then followed Lara to the house of the latter and obtained heroin, which he cut, used some himself, and sold the rest.

At another time, Jose wished to obtain half an ounce of heroin for a purchaser, so he called Rudolph Leyvas and went to see him where he was in a hospital. He there gave $200.00 to Rudolph, who then made a telephone call and told Jose to go to the house of Lara. Jose then went to the house of Lara, obtained the heroin,

delivered it to the purchaser who had given him the money in the first instance, and kept some for himself.

After Jose Ruiz was arrested in 1955, Rudolph Leyvas approached Elizabeth Ruiz and told her that Gilbert Quesada was doing well and that, if the witness would hold "stash" for Gilbert, the latter would pay Elizabeth $100.00 per week. "Holding stash" is a slang term for keeping stored equipment and narcotics for an operator or a pusher. Thereafter, Gilbert Quesada and Lonnie Rodriguez came to the residence of Elizabeth, where arrangement was made by Quesada in the presence of Rodriguez to obtain an apartment for Elizabeth and pay for it and to give her $100.00 and another $100.00 every time he ran out of the stuff and had to come back. The apartment was secured, and for about six weeks thereafter Quesada and Rodriguez brought brown powder, which they mixed with milk sugar there. After this period, Elizabeth moved to the house of her sister-in-law, with the help of Quesada, and there kept the "stash" of defendants. However, Elizabeth became nervous upon seeing a man near the house. She destroyed about an ounce of brown powder and hid three ounces under a big rock. Later, Elizabeth and Quesada went out to this location and picked up the package where Elizabeth had hidden it.

Defendants Raul Castulo Nunez and Rudolph Angel Lara made statements admitting for themselves the dealing in narcotics which was charged. These statements were permitted in evidence by the court, with the caution that they were applicable to the particular defendant who made them alone and not as to the other defendants.

The evidence alone shows that there was a single unified conspiracy, in which all appellants were willing and knowing participants. The case of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, cited by appellants, has absolutely no relation to the case at bar. See Blumenthal v. United States,

332 U.S. 539, 558–559, 68 S.Ct. 248, 92 L.Ed. 154.

■ There is no basis in law or fact to predicate error on the refusal of the trial court to order a daily transcript for defendants at the expense of the United States. Apparently counsel for appellants used part of the daily copy. Even if there were a suggestion that appellants might be legally prejudiced by the refusal, which there is not, this circumstance would remove all ground of complaint.

■ There is error assigned that the trial judge posted Marshals at the exits from the courtroom during the trial. The trial court was charged with the safety of counsel, jury and whatever innocent spectators there were. Besides, it was requisite to maintain custody of more than twenty defendants. It was within the discretion of the court to protect against a "mob" of traffickers in narcotics. There was no necessity to leave an opportunity for anyone to go out a window, as did Indian Joe in "Tom Sawyer."

■ Finally, it is objected that Jose Ruiz had been in trouble with the government and had theretofore been convicted and that he was unworthy of belief. It is charged by appellants that "the Government had actual notice before the case was ever commenced that their chief witness was in fact a narcotic addict, a perjurer, a thief and a robber, a pimp, and a *smuggler of heroin*." (Emphasis supplied.) It might be suggested that these are possible reasons for the use of Jose Ruiz by appellants in this major conspiracy in dealing with narcotic drugs. Much might have been said about Elizabeth Ruiz also, but appellants do not say it. Unfortunately for the prosecution, those of blameless lives are rarely chosen as companions by operators of "dope rings." Therefore, such persons seldom have opportunity to testify in prosecutions of this sort.

Although it will not be reviewed, the record contains overwhelming evidence

**278**

corroborating the testimony of Jose Ruiz and Elizabeth Ruiz, and the testimony of these two witnesses is consistent and each complements and fills gaps in the story of the other.

This Court has dealt with this case at length on account of the importance thereof to society and the enforcement of law. But this last must be said. There was not a scintilla of fact or law upon which to base an appeal. The appeal might well be dismissed as frivolous. Instead, the judgment is affirmed.