[Crim. No. 8480. Second Dist., Div. Two. July 24, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. IVAN NEIGHBORS, Defendant and Appellant.

Burton Marks, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—This appeal is brought by Ivan Neighbors, one of four defendants jointly charged with violating section 182, Penal Code, by combining, confederating and agreeing together to sell a dangerous drug, i.e., amphetamine, contrary to the provisions of section 4227, Business and Professions

Code. Appellant was convicted following a jury trial; his three alleged coconspirators previously entered pleas of guilty to the same charge.

Appellant's assignments of error are stated as follows: "(1) The evidence did not sustain the conviction, since it established (if anything) multiple conspiracies rather than a single conspiracy; and (2) there was prejudicial misconduct by the prosecuting attorney during argument to the jury."

[1a] The evidence, viewed in a light favorable to respondent, may be summarized as follows: At approximately 5:30 p.m., on November 8, 1961, Deputy Sheriff Bart Natison, who was operating as an undercover investigator and a confidential informant, known as "Gene," met the codefendant Givens at a gasoline station where the latter was employed. The informant asked Givens if they could "score."[1] Givens replied that he did not have anything with him, but that he had some "bennies"[2] at his residence. He further stated, "Phyllis has the rest of my stuff for me."

Officer Natison advised Givens that he did not know Phyllis. Thereupon Givens gave the two men an introductory note. It was read into the record as follows: "It states, 'Phyllis, give Gene [the informant] the rest of the roll,' and 'roll' is spelled r-o-o-l, 'will get some more tonight.' Signed 'Eddy.' "

Officer Natison and the informant then proceeded to the address indicated. Upon entering, they met the other codefendants, Phyllis Jane Dickerson and her sister Rita Minniear, and appellant. After the officer had identified Phyllis, he gave her the note he had received from Givens. After she had read the note, she obtained an aluminum foil package containing five white tablets from her purse. She then asked the officer for the money; he told her that he would give the "bread"[3] to Givens the following day.

Although the officer had not as yet spoken to him, appellant asked the officer how many more "rolls" he wanted. The officer replied, "two more," and then walked toward appellant. Appellant advised the officer that these would cost "a

---

[1]The expression "score" was defined as a term meaning "to purchase narcotics" as employed in the jargon of those in the narcotic field.

[2]Although not expressly defined, it is clear from the record that "bennies" is a slang diminutive for benzedrine tablets. It was stipulated that an expert witness if called would testify that the tablets involved in these proceedings contained an amphetamine commonly known as benzedrine and that they constituted dangerous drugs as defined in section 4227, Business and Professions Code.

[3]"Bread" was defined as the slang term for money.

dollar a roll." The officer handed him a five dollar bill. Phyllis Dickerson said that she could "make change for the five," but Rita Minniear said, "No. I have the change." Thereupon, appellant handed Rita the five dollar bill and told her, "Give him two rolls and $3.00 change." Rita opened her purse and from a brown paper bag therein containing a number of aluminum foil packages, she removed two and handed them to the officer. The officer remained on the premises for a time seated on the couch and conversed with appellant about records. He left without making any arrests.

The following day the officer returned to the gasoline station and paid Givens for the "pills" which Phyllis had given him. Givens informed him that he had met Danny who served as his "connection."[4] (Although the information indicates appellant's true name as "Ivan," it is clear from the record that he was known as "Danny.") Givens asked the officer to "drop back again."

■ Testimony concerning the initial conversation between Givens and the officer was permitted over appellant's objection, subject to a motion to strike in the event that the prosecution failed to establish a prima facie case of conspiracy without the aid of such conversation. This was entirely proper. ■ The order of proof prescribed by section 1870, subdivision 6, of the Code of Civil Procedure may be varied in the discretion of the court. (*People* v. *Cancimilla,* 197 Cal.App.2d 242, 249-250 [17 Cal.Rptr. 498]; *People* v. *Allen,* 104 Cal.App.2d 402, 415 [231 P.2d 896].) Appellant made no motion to strike. Moreover, as stated in *People* v. *Calhoun,* 50 Cal.2d 137 [323 P.2d 427], at page 144:

"It was not necessary to connect defendant with the conspiracy at the beginning of the evidence or before any other evidence of a conspiracy was received. As defendant concedes, the court had a reasonable discretion as to the order of proof, and there is nothing to indicate that this discretion was abused." (See also, *People* v. *Ferlin,* 203 Cal. 587, 598-599 [265 P. 230]; *People* v. *Buono,* 191 Cal.App.2d 203, 237 [12 Cal.Rptr. 604].)

■ By way of defense, appellant testified in substance that although he sat in the room where the two sales of the dangerous drug were made by Phyllis and Rita, he failed completely to comprehend what was happening. He testified to

---

[4] "Connection" was defined as "the supplier of narcotics, or the man you can go through to purchase narcotics."

the effect that when the officer handed him the five-dollar bill, he innocently handed it on to Rita with the comment to the officer, "You don't owe me any money," and that he was ignorant of the fact that a sale of any sort was taking place. Manifestly, the trier of the facts was justified in regarding this testimony as false.

Appellant also called Givens and Phyllis as witnesses, and they testified to the effect that, although they had pleaded guilty to conspiring with appellant to sell dangerous drugs, in fact, *appellant* was not involved. Actually, if their stories were to be given full credence, it would appear that they too, were equally innocent. Thus, it was Givens' version that he just happened to remember that Phyllis had some pills which she used for dietary purposes and which she might be willing to give to the informant who was leaving on a trip. Phyllis, in substance, testified that the pills were not hers and that she gave them to the officer only because Givens' note so instructed her.

By way of rebuttal, the prosecution called Rita Minniear who testified unqualifiedly that the two rolls of pills which she delivered to the officer were among those given her earlier by appellant, who told her to hold them for him.

As indicated by the assignment of error heretofore quoted, appellant recognizes the utter futility of arguing that the evidence is insufficient to establish a conspiracy to sell dangerous drugs. He therefore argues that three different conspiracies were proved which did not encompass the one alleged in the accusatory pleading. Thus, as stated in his brief, "Taking the case most favorable to the prosecution the evidence here, *at most* establishes the following conspiracies: (1) Givens and Dickerson, (2) Givens and Neighbors, and (3) Neighbors and Minniear."

He relies upon the decision in *Anderson* v. *Superior Court*, 78 Cal.App.2d 22 [177 P.2d 315], notwithstanding that the reasoning of said decision appears to refute his contentions. At pages 23-24 it was declared that:

"We are in full accord with the cases cited by petitioner to the effect that a conspiracy between A and B to commit a specific crime or crimes will not make A liable as a conspirator with B and C if B and C enter into a separate conspiracy to commit a different crime or crimes. However it is equally settled that 'One who joins a conspiracy after its formation is liable as a conspirator just as are those who originated it'

[citations], 'nor is it necessary that such conspirator should have seen the others, or have knowledge as to who all the members of the conspiracy are' [citations].

"This subject is so clearly discussed in *Lefco* v. *United States*, 74 F.2d 66 at pp. 68 and 69 as to warrant an extended quotation:

" 'There is nothing new in this defense of multiple conspiracies and nothing uncertain in the law arising from such a defense. Of course, to sustain a verdict on an indictment charging one particular conspiracy the evidence must establish the conspiracy charged. Evidence that establishes another conspiracy or several other conspiracies will not sustain the verdict. From this statement of law defendants, when in extremity, commonly resort to the contention that, not knowing all the conspirators or not knowing all the others were doing, they are responsible only for what they themselves were doing when caught, and as that usually is only a part of the conspiracy, they say, the part being less than the whole, it is different from the whole and in consequence is not the conspiracy alleged in the indictment and, for lack of proofs, they should be acquitted.

" 'Common design is the essence of conspiracy. The crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same unlawful result. [Citations.] All conspirators need not be acquainted with one another, nor need they have originally conceived or participated in the conception of the conspiracy. Those who come on later and cooperate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before. [Citations.] Nor does the mere fact that conspirators individually or in groups perform different tasks to a common end split up a conspiracy into several different conspiracies. [Citations.]

" 'Whether the proofs establish the conspiracy alleged by an indictment or establish several conspiracies not alleged may, however, be a valid question and in such case it is a question of fact for the jury. [Citation.]' "

 Appellant's second assignment of error is based upon the following portion of the prosecution's closing argument: "Now, you have got to compare their testimony. I will say once again there is no reason you should disbelieve Mrs. Minniear's testimony. Counsel certainly has given no reason

not to believe her testimony, except he did say, 'She has nothing to lose by her testimony.' I'll tell you what she has to lose, she has a pretty face to lose. She has got to face the defendant some day, whether he is found guilty or not. She has quite a bit to lose. Why wouldn't she look in that direction? Probably because she was afraid of the defendant, that's why. You better think seriously about that. She had plenty to lose. She had nothing to gain, except to make herself right with the world, to tell the truth, and being afraid of being prosecuted for perjury because she may have made some inconsistent statement at some other time; she had that to gain by telling the truth, not being prosecuted for perjury.''

In *People* v. *Perez,* 58 Cal.2d 229, 241 [23 Cal.Rptr. 569, 373 P.2d 617] (see also p. 240), our Supreme Court held the following argument by the prosecution to have been improper: '' 'Well, incidentally, I think it is quite clear and plain to you that he has an awful lot of motive to deny that he worked with the police in obtaining evidence of this nature. He obviously is worried for his own safety. He is worried for the safety of his life. . . .' ''

Initially, it should be noted that there are several important factual distinctions between the situations presented in the *Perez* case and in the instant case. First, in *Perez* the prosecutor was attacking the credibility of a key defense witness who had denied the very fact upon which the prosecutor's speculations rested, i.e., that he was the informer named by the police as having participated in the purchase of the narcotics.

In the instant case, however, it was clear that the prosecutor was only replying to attacks upon the credibility of a prosecution witness previously made by defense counsel during the course of his argument. The testimony of this witness was a fact disclosed to the jury during the trial itself, i.e., the witness had given testimony harmful to the defense, and which, if accepted by the jury, would result in appellant's conviction.

Although the arguments of appellant's counsel (to which the prosecutor obviously was replying) are not a part of the record before us, they apparently related to the inference which the jury should draw from the alleged fact that the witness had not looked at appellant while testifying. Since appellant interposed no objection to any portion of the prose-

cutor's arguments, he may complain thereof on appeal only in two instances. **[6]** These rules were stated in *People* v. *Perez, supra,* p. 247:

" ' "The general rule regarding misconduct of the district attorney which tends to and is likely to result in prejudice to the defendant is that where no objection is made to such misconduct by the defendant, or where objection is made and the court sustains the objection and properly admonishes the jury, the misconduct claimed to be prejudicial to defendant's rights will not furnish grounds sufficient to justify the granting of a new trial or the reversal of the judgment. [Citation.] There are two exceptions to this general rule. One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. [Citation.] The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. In such cases the misconduct will furnish ground for a reversal of the judgment, even where proper admonitions are given by the court." ' "

 Certainly, the prosecutor's arguments here disclosed were not of such a character as to bring them within the exceptions above stated, and, unlike the *Perez* case this is not one in which the evidence of the prosecution and that of the defense was closely balanced. In denying a new trial, the trial judge stated: "I should not grant a new trial in connection with this one phase of the case where, to my way of thinking, the evidence was sufficient, and I think the weight of it supports what the jury did."

The judgment is affirmed.

Fox, P. J., and Ashburn, J., concurred.