STEPHENS, J.
 

 This is a petition for writ of prohibition following a denial of motion under Penal Code section 995.
 

 Laurel, the petitioner here, and his codefendant, Russell, were charged by amended information with the following counts: (I) solicitation of one Beverford to join in the commission of a robbery (Pen. Code, § 653f); (II) robbery of one Simpkins (Pen. Code, § 211)
 
 ;
 
 (III) kidnaping one Simpkins
 
 *290
 
 for the purpose of robbery (Pen. Code, § 209) ; (IV) robbery of one King (Pen. Code, § 211); (V) kidnaping of one King (Pen. Code, § 209) ; (VI) kidnaping of one Salazar (Pen. Code, § 209); (VII) attempted robbery of one King (Pen. Code, § 664).
 

 The facts are substantially adduced by the testimony of one Murphy: On March 23, 1967, Murphy called defendant Russell. Russell drove to Murphy’s residence in Burbank and picked him up along with one Beverford. The three persons drove to a pancake house on San Fernando Road. Murphy asked Russell about some scheme to rob a hotel. After some conversation at the pancake house, the three proceeded to Russell’s apartment and there continued conversing about a robbery of an apartment, the specific layout of the apartment to be robbed and its office, doors and steps. All three men stayed at Russell’s place and the following day, the 24th, they continued their talks of the robbery. The detailed plan of how the robbery was to be accomplished was formulated.
 

 On the night of the 24th, Russell drove Beverford and Murphy to a coffee shop at Soto and Olympic. Russell told the other two he would return in half an hour after talking to an “inside man” on this robbery. The “inside man” was stated at that time to be a relative of Russell’s. Subsequently, the “inside man” was identified by Russell as “Bill,” the security guard at the apartment to be robbed, and the security guard was merely a friend. Telephone calls were had between a person referred to by Russell as “Bill,” both before and after the trip to the Soto-Olympic coffee shop. Russell drove away from the coffee shop, returning sometime later as he said he would. On his return, it was reported that the robbery would be more difficult than anticipated. The plan for the robbery was discussed again that evening, but not determined upon until the morning of the 25th.
 

 The scheme to be employed was that Russell was to walk past an apartment which was known as the residence of one King and one Simpkins. These two men worked at the office of the apartment and had the necessary keys and safe combination. Russell was to identify the King and Simpkins place by dropping his keys in front thereof. Beverford and Murphy were then to gain admittance and overpower and secure King and Simpkins and deliver the keys and combination to Russell. Russell was to accomplish the robbery of the safe in the apartment office. Russell related to the others that he had conversed with the security guard (the inside man) and that
 
 *291
 
 the robbery would take place between 8 p.m. and 9 p.m. when the guard would be out of the office; also, that if the guard did see the participants he would look away and not ‘ ‘ give us any hassle.” The time King and Simpkins were to get off work and be home was related by Russell after phone calls to “Bill.”
 

 Following this scheme, the three men drove to the vicinity of the apartment, stopping first at a food store, whence Russell stated he was to make a phone call to the guard, Bill. Russell returned to the car and the three proceeded to the apartment.
 

 After the car was parked, the three participants carried out the scheme as above related. Both King and Simpkins were forcibly restrained and moved from the vicinity of the door of their apartment to a bedroom therein. Each was bound by rope, and property, including the keys and combination, taken from their persons. In the course of this restraint, both a knife and hammer handle were used, the latter inflicting injury requiring stitches in the scalp of King. Beverford took the keys and combination to Russell, but Russell failed to complete the robbery of the safe.
 

 The three men, after Russell reported his failure, determined to make a further effort to accomplish that which Russell had failed to do. In the process, Bill, the guard, was seen at a position in the alleyway. Bill, with drawn gun, motioned Murphy and the others away, and Russell stated “he was motioning us away and let’s get out of here.” The three returned to the car and drove to Russell's apartment. Russell made a phone call to the guard, Bill. Russell left, then returned after the expiration of some period of time and reported that King was not in serious condition and had had stitches. This was reported at about 11:30 p.m., Saturday, the 25th. Nothing else was done until the morning of the 26th, when Russell again made a phone call. After the call, Russell said that the guard was enthused, that he wanted in on the job that was to be pulled.
 

 Thereafter, a new plan was conceived in the expectation of accomplishing the robbery. The new scheme called for the guard to call the plumber to fix a toilet at around 8 p.m.; that upon arrival of the plumber, he would be “jumped” and required to call for the guard to open the apartment office, and after a pretended “hassle” by the guard, he would be gently subdued and tied. Russell would then open the safe, and the robbery would be completed.
 

 
 *292
 
 The robbery was set to take place the night of the 26th, and following another phone call from Russell to the guard, the plan was to commence at the expiration of 10 minutes from the call. Russell, B ever ford and Murphy took positions near the apartment and awaited the arrival of the plumber. Very shortly thereafter, the plumber (Salazar) did arrive. He approached the apartment, and, in accordance with the stated plan, Murphy put a knife to his back and cautioned about attempting escape or calling for help. At this moment, a civilian employee of the apartment arrested Murphy, enforcing the arrest by putting a gun on Murphy.
 

 Subsequently, it was established that the guard, Bill, was the defendant, Laurel; that Laurel was found to have on his person the safe’s combination and that this was without authorization. The fact that Laurel had in fact called the plumber as outlined in the above stated robbery plan was established, plus Russell’s possession of the phone number and diagram of the apartment office.
 

 Defendant’s contention before us is in the singular: “No competent evidence was presented at the preliminary examination to show reasonable or probable cause for believing that petitioner was a principal to the offenses charged in the complaint or Amended Information, and, that lacking such reasonable or probable cause to believe that petitioner committed the offense charged, the Motion to Dismiss the Information should have been granted and this Writ of Prohibition should therefore issue. ’ ’
 

 We have referred in the facts to phone conversations between Russell and Laurel, the substance of which was related by the witness, Murphy. Timely hearsay objection was made to this testimony of Murphy as to the contents of phone calls allegedly made by Russell to Laurel. Murphy did not hear any of the alleged conversations or even that such phone communication was had between Russell and a third person. Murphy did see Russell go to the phone and heard him speak the name, “Bill.”
 

 The objection was made early in the witness’ testimony, and the court reserved ruling thereon; a continuing or running objection was deemed made to questions of this nature. The trial court did not rule upon the objection; thus the failure to rule formally is an implied ruling against the objection and in favor of admissibility. The question of admissibility of such testimony may be properly raised on appeal. (Witkin, Cal. Evidence (2d ed. 1966), § 1300, p. 1203.)
 

 
 *293
 
 Evidence Code, section 1223 codifies the established rule making admissible a statement of the declarant “while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; ’ ’ Therefore, if there is independent proof of the existence of a conspiracy, then statements by one coconspirator are admissible as against others under the exception to the hearsay rule. We have such independent proof of the existence of the conspiracy and of Laurel being one of the conspirators in the instant case.
 

 It is established, as independent fact, that Russell acquired knowledge as to the physical arrangement of the apartment office and the location of the safe therein. The knowledge of the residence of the two men, King and Simpkins, their employment, their possession of apartment office keys and safe combination, the time and order at which they would be at their residence were within Russell’s knowledge. The fact that there was an apartment security guard and that his name was “Bill’’ was known. These facts could come only from someone intimately familiar with the scene and cognizant of the activities of King and Simpldns.
 

 The reasonable inference from the facts upon which the scheme for robbery was premised proved accurate even to the warning away by the guard of the participants from further activity when the risk of capture was imminent. The act of the guard’s warning itself constituted independent evidence of participation by Laurel, as did the subsequent call to the plumber by “a security guard to fix a toilet that was out of order at 2929 East Olympic’’ and that Laurel was a guard at the stated time and place. The unauthorized possession of the safe’s combination by the guard and the fact that Russell had the apartment office phone number written on a slip of paper are additional such facts. We conclude, as did the trial court, that a conspiracy to carry out an unlawful act was established involving Laurel as one of the conspirators; hence, the statements of Russell reciting telephone conversations and identifying Laurel as a participant thereto were admissible.
 

 We have examined the record before us and all exhibits admitted. Nowhere do we perceive that Russell, Murphy or Beverford were other than initial conspirators in the planned robbery. The evidence involves defendant Laurel as a participating conspirator. The crime charged in count I, alleging the crime of solicitation to commit robbery (Pen. Code, § 653f) of one of the initial conspirators (Beverford) fails for
 
 *294
 
 •want of any supporting fact. The gist of the offense is •the solicitation of the commission of one or more of the offenses listed in the statute, and not its commission
 
 (People
 
 v.
 
 Rissman,
 
 154 Cal.App.2d 265 [316 P.2d 60];
 
 People
 
 v.
 
 Humphrey,
 
 27 Cal.App.2d 631 [81 P.2d 588]), whether the idea was one which the person solicited had previously entertained or not
 
 (People
 
 v.
 
 Wayne,
 
 41 Cal.2d 814, 825 [264 P.2d 547]), or whether the solicitation was in response to some act .or statement of the person solicited. For one person to solicit another to do a thing, there must be an intent and a request.
 
 (People
 
 v.
 
 Shapiro,
 
 170 Cal.App.2d 468, 478 [338 P.2d 963].) This differs from the situation of coconspirators, for their conspiracy need not arise by way of solicitation of one by the other.
 
 [1]
 
 All that the evidence before us. supports is a willingness and cooperative planning of a robbery without the slightest fact that Beverford was requested or solicited to do or join in doing the crime involved.
 

 We determine also that the charge of kidnaping (Pen. Code, § 209) of Salazar, the plumber, (count VI) is not supported by the facts. The evidence discloses that at the same time Salazar was restrained by Murphy, the arrest of Murphy was occasioned, and the further perpetration of any crime terminated. The crime of kidnaping is the forcible or fraudulent stealing or abduction of another person (Pen. Code, § 207. One essential element of the crime of kidnaping is that there be asportation or carrying away of the victim. It is the fact, and not the distance, of forcible removal which constitutes the offense.
 
 (People
 
 v.
 
 Phillips,
 
 173 Cal.App.2d 349, 351 [343 P.2d 270];
 
 People
 
 v.
 
 Rich,
 
 177 Cal.App.2d 617, 621 [2 Cal.Rptr. 600].)
 

 We determine also that the charge of attempted robbery of one Harry B. King on the 26th day of March, 1967, as charged in count VII, is not supported by the evidence. This count appears to refer to the attempted robbery or burglary of March 26, 1967, as distinguished from the acts committed on March 25th. The robbery of King was complete (as distinguished from attempt) on March 25th, and this is count IV in the amended information. Apparently it was assumed that the evidence established some possessory or custodial right by King in and to the apartment safe on that date. There is no evidence to this fact. Further, there is no showing that King
 
 *295
 
 was even on the premises on the 26th, and, depending upon the seriousness of his wounds, he may well have still been hospitalized.
 

 Since no person was identified as being present and in possession of the safe on March 26th, King or anyone else, there is not established an attempted robbery. By very definition, robbery requires the felonious taking of personal property from a person or immediate presence of a person. The information may well be amended to include an attempted burglary as related to the acts of the defendant on March 26th in furtherance of the scheme to obtain the safe’s contents, but we do not pass on what amendments, if any, may be warranted.
 

 The remaining counts, II (robbery of Simpkins (Pen. Code, § 211)) ; III (kidnaping of Simpkins for purpose of robbery (Pen. Code, § 209)); IV (robbery of King (Pen. Code, § 211)); V (kidnaping of King for purpose of robbery (Pen. Code, § 209)), are each adequately supported by the evidence. The sole question to be determined by us with regard to each of these counts is whether or not defendant Laurel participated in any or all of them.
 

 The participation of Laurel is established by the testimony of Murphy, involving Laurel through phone calls to Laurel by Russell, the abortive execution of the first scheme to accomplish the robbery, which included Laurel’s waving Murphy, Beverford and Russell away to secrete the identities of the perpetrators, further phone calls from Russell to Laurel and formation of a new scheme involving Laurel’s call for the plumber, and that plan’s actual commencement for accomplishment, including Laurel's call to the plumber and his unauthorized possession of the safe’s combination. It is not necessary that Laurel actually have been present at the time the acts constituting counts II, III, IV and V were committed. It is sufficient if the acts are in perpetration of the crime for which the conspiracy was formed and that Laurel be one of the conspirators.
 

 Let the peremptory writ of prohibition issue as prayed as to counts I, VI and VII. The petition for a writ of prohibition is denied as to counts II, III, IV and V.
 

 Kaus, P. J., and McCoy, J. pro tern.,
 
 *
 
 concurred.
 

 [1]
 

 We do not say that one who has solicited another may not he a conspirator in the commission of the crime solicited. We do say that in a conspiracy, one coeonspirator
 
 need not
 
 have solicited another.
 

 *
 

 Assigned by the Chairman of the Judicial Council.