[Crim. No. 2739. Fourth Dist., Div. Two. June 21, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD A. MORALES, Defendant and Appellant.

Julius J. Novack for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

TAMURA, J.—Defendants Morales and Velasquez were indicted for the sale of marijuana (Health & Saf. Code, § 11531). Count I charged both Morales and Velasquez with a sale on April 8, 1966, and count II charged Velasquez only with a sale on April 7, 1966. Each defendant was charged with and admitted priors involving narcotics—Morales had three priors and Velasquez two. Defendants moved for separate trials on *Aranda* grounds (*People* v. *Aranda,* 63 Cal.2d 518 [47 Cal. Rptr. 353, 407 P.2d 265]). The motion was denied and following a joint jury trial, they were found guilty as charged and sentenced to state prison. Defendants filed separate notices of appeal. The present appeal concerns only Morales.

On April 7, 1966, at about 8 p.m., Reyes and Tryal, state

narcotics investigators, and one "Chico" (Andres Galindo), a former narcotics user who was acquainted with Morales and Velasquez and who was then cooperating with the Colton Police Department, met Velasquez at the Schooner Bar in Bloomington. "Chico" introduced the investigators to Velasquez and asked the latter if he could obtain a "can of weed." Velasquez replied, "Yes, I have to ask Donny first," (Morales' first name was Donald), went to a phone booth, and after a few minutes returned saying, "Let's go, the guy is waiting for us." The four (Reyes, Tryal, "Chico" and Velasquez) drove to Morales' home and upon arrival Velasquez entered the house but returned shortly stating that the "guy" did not have proper change. The officers obtained change, Reyes handed Velasquez $16, Velasquez re-entered the house and returned to the car shortly stating, "I have got a very good can, not a very large can, but it is all real pot." They drove to Velasquez' apartment where he removed a brown paper bag from his jacket pocket, checked the contents and handed the bag to Reyes, saying, "[T]here better not be any trouble over this because I could [get] off easier by killing a man than going back to jail on selling dope. I am facing 15 years. . . ." As the four drove back to the bar, Reyes asked Velasquez if "Donny" could make it for a pound or a "kilo;" Velasquez told the officers to contact him the following evening at the same time and place. The paper bag received by Reyes that evening contained marijuana.

At about 7:45 p.m. of the following evening, Reyes, Tryal and "Chico" again met Velasquez at the Schooner Bar. When Reyes asked if he could make it for a "kilo," Velasquez replied, "Just a minute, I will call Donny," went to the rear of the bar to a telephone, returned in a few minutes and said, "Donny is not in, let's go over and he may be there by the time we get there." The four again drove to Morales' home, Velasquez entered the house but returned shortly saying "Donny" was not there. At that moment Morales drove up in his car and parked adjacent to the house. The officers observed Velasquez and Morales converse and, as Velasquez returned to the car, overheard Morales say, "Make sure you are down there because I don't want to take one with me and have to bring it back." Velasquez entered Reyes' car and the four returned to the Schooner Bar. Enroute Velasquez said that if "Donny" could obtain two "kilos," he would let Reyes have one kilo for $100 and that if Morales could only obtain one "kilo," he would let Reyes have "three cans."

After they returned to the bar, at about 9:20 p.m., Velas-

quez told Reyes, "I will call Donny," went to a telephone at the rear of the bar and returned in a few minutes saying, "Donny is on the way. He could only get one kilo, he is bringing three cans." At his request, Reyes gave Velasquez $40. About 10 p.m., Morales appeared, conversed with Velasquez and the two left by the rear entrance. Reyes followed and observed Velasquez and Morales go to the latter's car and saw Velasquez hand Morales something and Morales reach into the front of his automobile and hand Velasquez a "paper item." Reyes met the two at the rear entrance of the bar. While Morales was only a few feet away Velasquez told Reyes that "Donny" was his "connection." Velasquez told Reyes that he had "three cans" and asked him to follow him into the rest room but when someone else entered, suggested that they go to his apartment. Upon arriving at Velasquez' apartment, the latter removed three brown paper bags from his jacket pocket, checked the contents and handed them to Reyes. The contents of the bags were identified as marijuana.

Morales testified in substance as follows: He did not see Velasquez on April 7. On the night of April 8, he returned from a shopping trip and as he was taking groceries into his house, he observed Velasquez talking to an unidentified individual but when he, Morales, came out of the house the third person was gone. He conversed briefly with Velasquez who said he was going to the Schooner Bar that evening and Morales said he might meet him. The subject of marijuana was not discussed. While he was in the bar that evening, he remembered leaving his keys in his car so he went out to get them. He encountered Velasquez who accused him of taking out his girl; they exchanged a few words; he removed the keys from his car; the two shook hands and they re-entered the bar. There was no delivery of marijuana.

Velasquez testified in substance as follows: When he met Reyes on April 7, he had been unemployed for some time. "Chico" told him that he could earn some money by providing a "connection" for Reyes and displayed $50 in cash. "Chico" said that Reyes had been convicted of a narcotics offense in Sacramento and was in San Bernardino looking for a new "connection." At the insistence of "Chico" and Reyes, Velasquez agreed to make a call to Arlington. After making the call, he told Reyes that they could meet the unidentified man at "Donny's" house. On arriving at Morales' home, Velasquez met the unidentified man in the backyard, obtained a bag of marijuana, and subsequently delivered it to Reyes. On April 8, he again called the unidentified individual

in Arlington and arrangements were made to meet him at Morales' home. When they arrived, the man was there and Velasquez obtained from him "three cans" of marijuana. At that moment Morales arrived and the two discussed going to the Schooner Bar. That evening he encountered Morales at the rear of the bar; a discussion ensued concerning Velasquez' girl friend; the two shook hands; and they returned to the bar through the rear entrance. No narcotics transaction occurred between Velasquez and Morales.

Defendant Morales contends (1) the court erred in denying his motion for separate trial; (2) extrajudicial statements made by Velasquez which implicated Morales were erroneously received; (3) the court abused its discretion in denying his motion for continuance; (4) the evidence was insufficient to support his conviction; (5) the prosecutor was guilty of prejudicial misconduct; and (6) the court erred in denying his motion to visit the premises.

The first three points raised by defendant are all premised on the theory that the extrajudicial statements implicating him, made by Velasquez out of Morales' presence, constituted inadmissible hearsay insofar as the latter was concerned. He, therefore, contends that under the rules enunciated in *People v. Aranda, supra,* 63 Cal.2d 518, his motion for a separate trial should have been granted, or in the alternative, those portions of Velasquez' extrajudicial statements which implicated him should have been deleted.

The People contend that the statements were admissible against Morales under an exception to the hearsay rule which permits a declaration of a conspirator, made while participating in a conspiracy to commit a crime and in furtherance of that conspiracy to be received against a co-conspirator if there is independent proof of the existence of a conspiracy.

The exception is a well established rule of evidence. (Evid. Code, § 1223[1]; *People v. Ferlin,* 203 Cal. 587, 599 [265 P. 230]; *Laurel v. Superior Court,* 255 Cal.App.2d 292, 297

---

[1]Evidence Code, section 1223, provides:

"Admission of co-conspirator. Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

[63 Cal.Rptr. 114]; *People* v. *Hardeman,* 244 Cal.App.2d 1, 39-40 [53 Cal.Rptr. 168], cert. den. 387 U.S. 912 [18 L.Ed.2d 634, 87 S.Ct. 1700]; Witkin, Evidence (2d ed. 1966) pp. 492-493; 4 Wigmore, Evidence [3d ed.] § 1079; McCormick Evidence, pp. 521-522.) ■ The admissibility of the declaration of a co-conspirator. is not affected by the fact that the indictment or information fails to charge a conspiracy. (*Lee Dip* v. *United States* (9th Cir. 1937) 92 F.2d 802-803, cert. den. 303 U.S. 638 [82 L.Ed 1099, 58 S.Ct. 526]; *People* v. *Duran,* 57 Cal.App.2d 363, 371 [134 P.2d 305]; see *People* v. *Ferlin, supra,* 203 Cal. 587, 599; *People* v. *Gregory,* 12 Cal.App.2d 7, 15 [54 P.2d 770].) Ordinarily there must be some proof of a conspiracy before the declarations of the co-conspirator may be received but the trial court may, where it deems that the circumstances so require, relax the rule and permit the declarations to be received first, subject to the establishment of the existence of a conspiracy by independent evidence. (Evid. Code, § 1223; *People* v. *Calhoun,* 50 Cal.2d 137, 144 [323 P.2d 427]; *People* v. *Ferlin, supra; People* v. *Neighbors,* 218 Cal.App.2d 593, 596 [32 Cal.Rptr. 473]; 4 Wigmore, Evidence [3d ed.] § 1079, pp. 999-1000.)

■ If the statements implicating Morales were admissible against the latter as declarations of a conspirator against a co-conspirator, the principles enunciated in *Aranda, supra,* would be inapplicable. (*People* v. *Gant,* 252 Cal.App.2d 101, 110 [60 Cal.Rptr. 154]; *People* v. *Hardeman, supra;* Witkin, Cal.Criminal Procedure, 1967 Supp., p. 51.) *Aranda, supra,* was directed against extrajudicial statements implicating a co-defendant which were otherwise inadmissible against the non-declarant defendant. The court held that an admonition to the jury that such statements should be considered only as against the declarant failed to provide adequate protection to the codefendant. In the present case, if Velasquez' statements implicating Morales were admissible against the latter as a declaration of a conspirator admissible against a co-conspirator, a separate trial would not afford Morales any greater protection.

Defendant contends that the principles announced in *People* v. *Aranda, supra,* 63 Cal.2d 518, must be deemed to extend to declarations of a conspirator admissible against a co-conspirator because there was evidence in that case that the defendants were engaged in a conspiracy. However, the extrajudicial statements involved in *Aranda* were those made by the codefendant during his interrogation by officers after arrest. Thus, even assuming that a conspiracy had existed,

such declarations would have been inadmissible against the non-declarant. ■ Confessions or admissions of a co-conspirator made to officers after his apprehension and arrest are not in furtherance of the conspiracy and do not fall within the exception to the hearsay rule. (*Fiswick* v. *United States*, 329 U.S. 211, 217 [91 L.Ed. 196, 200-201, 67 S.Ct. 224]; *People* v. *Luker*, 63 Cal.2d 464, 476 [47 Cal.Rptr. 209, 407 P.2d 9]; *People* v. *Roberts*, 40 Cal.2d 483, 489 [254 P.2d 501].)

The decisive issue, therefore, is whether, independent of the declarations of Velasquez, there was sufficient proof of a conspiracy.

■ The elements of conspiracy are (1) an agreement; (2) specific intent; (3) unlawful objective; and (4) overt act. (*People* v. *Aday*, 226 Cal.App.2d 520, 533 [38 Cal.Rptr. 199], cert. den., 379 U.S. 931 [13 L.Ed.2d 343, 85 S.Ct. 329]; 1 Witkin (1963) Cal. Crimes, p. 99.) ■ The existence of an agreement may be shown by circumstantial evidence. (*Bompensiero* v. *Superior Court*, 44 Cal.2d 178, 184 [281 P.2d 250]; *People* v. *Olf*, 195 Cal.App.2d 97, 107 [15 Cal.Rptr. 390]; *People* v. *Massey*, 151 Cal.App.2d 623, 651 [312 P.2d 365].) It is not necessary to show that the parties met and actually agreed to undertake the performance of an unlawful act or that they had previously arranged a detailed plan for its execution. (*People* v. *Cockrell*, 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116], cert. den. 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568]; *People* v. *Calhoun*, *supra*, 50 Cal.2d 137, 144; *People* v. *Massey*, *supra*, p. 651.) There need be no showing of a direct association by the members of the conspiracy. (*People* v. *Cockrell*, *supra*, p. 667; *People* v. *Olf*, *supra*, p. 105.) "The agreement may be inferred from the conduct of defendants, mutually carrying out a common purpose in violation of a penal statute." (*People* v. *Cockrell*, *supra*, p. 667; *People* v. *Causey*, 220 Cal.App.2d 641, 653 [34 Cal.Rptr. 43].)

■ The evidence heretofore summarized, together with all reasonable inferences favorable to the People which may be drawn therefrom, independent of the declarations made by Velasquez, constituted sufficient foundational proof of the existence of a conspiracy to permit the introduction of extrajudicial statements made by Velasquez implicating Morales.

■ The foundational requirement may be met without establishing a conspiracy beyond a reasonable doubt or even by a preponderance of the evidence; only prima facie evidence of the fact is required. (*People* v. *Steccone*, 36 Cal.2d 234, 238

[223 P.2d 17] (disapproving language in *People* v. *Doble,* 203 Cal. 510, 517 [265 P. 184], indicating requirement of greater amount of proof) ; *People* v. *MacEwing,* 216 Cal.App.2d 33, 44 [30 Cal.Rptr. 476] ; *People* v. *Miller,* 185 Cal.App.2d 59, 73-74 [8 Cal.Rptr. 91] ; *People* v. *Massey, supra,* p. 642; 4 Wigmore, Evidence, § 1079.)

■ Independent of the declarations of Velasquez, the evidence shows that Reyes was introduced to Velasquez for the purpose of making a purchase of marijuana; Velasquez made a phone call; following the call they went to Morales' home where Velasquez was provided with $16 in cash, entered the house, returned and at his apartment removed a package containing marijuana which he delivered to Reyes; the next evening when Reyes asked Velasquez for ''one kilo,'' the latter again made a phone call, they went to Morales' house, Velasquez and Morales conversed, and Morales was overheard to say to Velasquez, ''Make sure you are down there, because I don't want to take one with me and have to bring it back;'' after they returned to the bar Velasquez made another phone call and requested $40 which Reyes paid; when Morales entered the bar, the two went out to Morales' vehicle where Velasquez handed Morales something and Morales reached into his car and handed Velasquez a ''paper item'' and Velasquez thereafter delivered 3 bags of marijuana to Reyes.

The, evidence was sufficient to raise an inference that an agreement existed between Velasquez and Morales to sell marijuana. ''It has been held that persons can be prosecuted as conspirators if, by buying, selling, or doing some other act, they knowingly participated in a general plan to place narcotics in the hands of ultimate users. (*United States* v. *Aviles,* 274 F.2d 179, 188; *Leyvas* v. *United States,* 264 F.2d 272, 273 et seq.; *United States* v. *Rich,* 262 F.2d 415, 417-418; *United States* v. *De Fillo,* 257 F.2d 835, 838.)'' (*People* v. *Van Eyk,* 56 Cal.2d 471, 479 [15 Cal.Rptr. 150, 364 P.2d 326].) In *United States* v. *Rich, supra,* the court, after pointing out that the sufficiency of evidence relative to the establishment of a conspiracy must be viewed against a background of the type of crime involved, stated at p. 418:

''If there be knowledge by the individual defendant that he is a participant in a general plan designed to place narcotics in the hands of ultimate users, the courts have held that such persons may be deemed to be regarded as accredited members of the conspiracy.''

In *People* v. *Cockrell, supra,* 63 Cal.2d 659, in concluding that the evidence was sufficient to support a conviction for

conspiracy to sell marijuana, the court stated at p. 668:

"Here the evidence, viewed in the light most favorable to the prosecution, discloses that the Cockrells were in possession of a large quantity of marijuana, that on two occasions Miss Phillips obtained marijuana at the home of the Cockrells for sale to Greene, and that each of the Cockrells participated in one or both of the sales to Greene. This evidence is sufficient to show an agreement between the Cockrells and Miss Phillips to sell marijuana and overt acts in furtherance of that agreement."

*People* v. *Wells,* 256 Cal.App.2d 463 [64 Cal.Rptr. 59], cited by defendant, is not controlling. The issue here involved was not considered.

The record discloses that the jury was properly instructed that it must not consider an alleged conspirator's declaration against a co-conspirator unless it first determines from other independent evidence that a conspiracy existed. Morales complains that the court should have instructed the jury, as in *People* v. *Roberts, supra,* 40 Cal.2d 483, that the statements could only be considered against Velasquez. Reliance upon *Roberts* is misplaced, however, because it related to extrajudicial statements made by a co-conspirator to arresting officers after he had been apprehended.

Defendant contends that it was error to receive statements made by Velasquez on April 7 because there was no independent evidence of a conspiracy at that time and Morales was not charged with the sale made that day. The contention is without substance. Though ordinarily proof of the existence of a conspiracy should precede proof of the declaration of the co-conspirator, the court may, in its sound discretion, reverse the order of proof. In the instant case there was no abuse of discretion. The declarations made by Velasquez on April 7 were in furtherance of the conspiracy and were clearly relevant to prove that Morales made the sale on April 8. (See *People* v. *Causey, supra,* 220 Cal.App.2d 641, 654; *People* v. *Temple,* 15 Cal.App.2d 336, 339 [59 P.2d 417].)

 There is no merit in the contention that the court abused its discretion in denying Morales a continuance. The chronology of the court proceedings reveals the following:

May 12, 1966 Indictment filed.

May 18, 1966 Mr. Novack appeared for defendant and requested a continuance to permit further discovery. The matter was continued to June 1.

June 1, 1966 Motion made to dismiss under section 995.

| | | |
|---|---|---|
| June 17, 1966 | Motion denied and continued to June 20 for a hearing on motion for severance. |
| June 20, 1966 | Motion for severance on *Aranda* grounds heard and denied and trial set for June 22. |
| June 22, 1966 | Matter reset for trial for June 27. |
| June 27, 1966 | Mr. Novack renewed motion for severance which was denied and the matter was set for trial for June 29. |
| June 29, 1966 | Matter trailed. |
| June 30, 1966 | Reset for July 5. |
| July 11, 1966 | Trial commences. |

Defendant was thus afforded ample opportunity to prepare for trial. His claim that he was surprised by the prosecutor's theory of conspiracy is not substantiated by the record. The record reveals that on June 20 at the hearing on the motion for severance, the district attorney argued that *Aranda* was inapplicable because the People intended to proceed on the theory of a conspiracy.

The contention that the evidence was insufficient to support the conviction is likewise without merit. There was substantial evidence to support the verdict. (*People* v. *Newland*, 15 Cal. 2d 678, 681 [104 P.2d 778].)

■ Defendant contends that certain questions and remarks by the prosecutor constituted prejudicial misconduct.

During the cross-examination of "Chico," he was asked where he resided. The prosecution's objection on the ground that it was irrelevant and immaterial "for the purpose of witness' safety" was sustained. Defendant contends that the quoted portion of the objection constituted misconduct in that it implied that "Chico's" life would be endangered if defendants were not convicted. He also contends that the implication was further emphasized by the prosecutor during the direct examination of Officer Tryal by propounding the question whether he (Tryal) was in the district attorney's office the previous day with "Chico" and why he was ordered to remain with him. Tryal's answer was "To protect Galindo [Chico]."

The remark of the district attorney in support of his objection to defendant's question relating to "Chico's" residence was non-prejudicial. There is nothing in the record to indicate that the remark was made in bad faith for the purpose of suggesting to the jury that the witness' life would be endangered if defendants were not convicted. Nor does defendant

suggest that the court's ruling sustaining the objection deprived him of a constitutional right of confrontation and cross-examination. (See *Smith* v. *Illinois*, 390 U.S. 129 [19 L.Ed.2d 956, 88 S.Ct. 748].) In *Smith, supra,* the Supreme Court held that the denial of a right to cross-examine an informer-witness respecting his true name and place of residence constituted a denial of due process where the informer who made the purchase of a narcotic was the only witness for the prosecution and the case turned on his credibility as against that of defendant. In the present case, "Chico's" testimony was substantially the same as, and merely corroborated, the testimony previously given by Officers Reyes and Tryal.

The testimony of Officer Tryal that he had been instructed to remain with "Chico" in the district attorney's office to protect him was properly received. Earlier, during the cross-examination of "Chico," defense counsel elicited from him the fact that he was alone with Tryal in the district attorney's office "yesterday morning." Although on cross-examination, "Chico" denied discussing the case while he was with Tryal, Tryal's testimony was proper to rebut any inference that the two were together for the purpose of rehearsing "Chico's" testimony.

██ Defendant contends the court erred in denying his motion for a jury view of the Schooner Bar as well as his residence.

Penal Code, section 1119, states in relevant part: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, . . . it may order the jury to be conducted in a body, in the custody of the sheriff, marshal or constable, as the case may be, to the place, or to such property. . . ." A jury view rests in the sound discretion of the trial judge and his determination will not be disturbed absent a showing of abuse. (*People* v. *Wong Hing,* 176 Cal. 699, 705 [169 P. 357]; *People* v. *Maupins,* 30 Cal.App. 392, 394 [158 P. 502]; *People* v. *Howard,* 28 Cal. App. 180, 181 [151 P. 754].) In the present case there is nothing in the record which discloses an abuse of discretion.

Judgment affirmed.

McCabe, P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied July 10, 1968, and appellant's petition for a hearing by the Supreme Court was denied August 14, 1968.